CHICAGO AND ROCK ISLAND RAIL ROAD COMPANY, Appellants, *v.* DANIEL WARD, Appellee.

APPEAL FROM LA SALLE.

In assessments of damages by default, the defendant should be allowed to cross-examine, or to introduce witnesses, to reduce the amount claimed; and if the inquest is taken in open court, to have the jury instructed as to the law. He may take a bill of exceptions, or move to set aside the inquest upon affidavit, and may assign errors upon the action of the Circuit Court in taking or approving the inquest.

Under a breach of covenant to erect and maintain fences, etc., on each side of a railroad, it is proper to show how much the land would yield each season, and the market value of the crops at harvest season, from which should be deducted the cost of tillage, harvesting and marketing, to ascertain the true measure of damage. SCATES, C. J.

In such a case it is proper to permit a party to prove what the crop would have been worth at its maturity, taking as the measure of damage the relative value of the growing crop for a series of antecedent years, to establish the value of the crop destroyed at the time of its destruction. Or, what would a prudent man have given for the crop destroyed, at the time, provided he should have it secured from trespass, and have the right to cultivate and secure it. SKINNER, J.

The amount of damage in such case, should be the value of the growing crop at the time of the breach of the covenant, to be established by then existing facts, and the judgment of men applied to them, as if the inquiry had been made the day the crop was destroyed, without admitting proof of any after occurring fact. CATON, J.

THIS was an action of covenant. The declaration assigned breaches of the following covenants entered into by appellants:

" Said railroad company shall erect, and perpetually maintain, on each side of said railroad, across the plaintiff's land, a good and substantial fence, and suffer the owner of said tract of land, his heirs and assigns, to join the said fence without charge; said company shall construct, and maintain perpetually, across said road a secure and convenient crossing for cattle and carriages, and that the same shall be perpetually kept and maintained free and open for the use of said owner, his heirs or assigns, as appurtenant to said land. Said company shall not, (until they have constructed a fence on each side of said road, as above provided,) so lay open or remove any fence on said land, as to expose any field inclosed thereby to the incursion of cattle from without, or so as to permit the escape of cattle from within the same."

Breach, that the defendants crossed the land of plaintiff, and neglected to fence the following strip of land, to wit: a strip of land fifty feet wide on each side of the centre line of the track of the railroad, commencing at a point four chains eighty-seven links north of the southwest quarter corner of the southeast quarter of section eighteen, township thirty-three, range five east of the third principal meridian, running thence south seventy-three degrees, east eight hundred and sixty-nine and four-tenths feet.

Judgment by default. A jury was called to assess damages.

The following is a copy of the bill of exceptions taken at the inquest:

" Be it remembered, that on the first day of the present term of this court, the above named defendants, by Hoes, attorney, moved the court for leave to file pleas in said cause, and in support of said motion, submitted and read the following affidavit, which motion was resisted by the plaintiff, who moved the court for judgment by default against the defendants, and read affidavit. Court overruled motion of defendants for leave to plead, and rendered judgment against defendants by default for want of a plea, to which decision of the court the defendants then and there excepted.

Be it also remembered, that by order of the court a jury was empanneled in open court to assess the plaintiff's damages in this cause, and thereupon the plaintiff introduced Joseph Mills as a witness, who testified as follows: I have lived in Marseilles four years. I am a blacksmith; am acquainted with Dr. Ward, the plaintiff; the plaintiff had an inclosure crossed by defendants' railroad; about six acres were cut off on the south side of said railroad, and something like twenty acres on the

north side. The defendants commenced making a cattle crossing in that field, but did not finish it. The embankment on each side of the railroad was cut down; the railroad makes a cut from two to five feet deep, at the crossing about three feet; no boards or timbers were put under the track; a person might cross with an empty wagon in that place, but not with a loaded wagon; could not cross the iron rail with a load; there was no cattle guard made; it would take three persons to drive cattle across the railroad there; cattle in that inclosure would have to go to Marseilles or to the canal for water; the defendant has put on a kind of cattle guard on Dr. Ward's land; the company entered that inclosure to commence their road in October, A. D. 1852; I think they kept the fence put up for three or four weeks thereafter. I did not see what the damage was on the crop in fall of 1852; hogs, colts and cattle got in the field; there was corn in the field. The Rock Island Railroad Company fenced the north side of their road in that field in May, 1853; there was corn planted on the land in 1853; the hogs eat it up entirely on the south side before the fence was made; the crop on the north side of the railroad was a good crop; it was the same sort of land on each side of the road. The plaintiff here asked the witness, What was it worth to attend to the corn on the six acres south of the road, from June 27th, through the season of 1853? To which question the defendants, by their counsel, objected. The court overruled the objection, and the defendants then and there excepted to said decision. The witness answered, The corn might have been tended for six dollars. The plaintiff then asked the witness, What amount of corn per acre was raised that year on the twenty acres north of the road? Were there ten bushels or more to the acre? To which question the defendants then and there objected. The court overruled the objection, to which decision the defendants then and there excepted. The plaintiff then asked the witness, When would that crop of corn have been merchantable, and what would it then have been worth? To which question the defendants objected, and the court overruled the objection, to which decision of the court the defendants then and there excepted. Answer, The corn would have been merchantable in November last when ripe, and would have been worth forty cents a bushel.

Cross-examined. My estimate of six dollars does not include harvesting the corn; it includes ploughing three times; it does include the preparation of the land and planting. The length of plaintiff's field is about sixty rods. I think it would cost twenty-five dollars apiece to make the crossings and cattle guards.

Direct resumed. The plaintiff then asked the witness the following question, What would it cost to harvest the corn on

the south six acres and take it to market? To which the defendants objected. The court overruled the objection, and the defendants then and there excepted. Answer, They paid three cents for husking it; was as easy to haul to the warehouse as to the barn; I think the corn is merchantable when ripe and ready to be taken from the field. The hogs got in a good deal on the north side; I think there were at least fifty bushels destroyed in the north field after it was ripe.

Cross-examination resumed. The plaintiff let it stand after they were running in it for a while until November.

The plaintiff then called Robert Dow as a witness, who testified as follows: I have been living in Marseilles four years; know plaintiff's land there. The railroad company have fenced their road through his land; the fence is not good. Some places the posts are set only one and a half foot in the ground, in some places the boards are not close enough together to keep hogs and sheep out. There is no crossing on plaintiff's land. It needs timber and plank and cattle guards, to make the crossing. At the place where to make a crossing, the railroad runs in an excavation from two to four feet. No planks on the track there. On the south side of the railroad, the company fenced in June or July, 1853; on the north side, before that time, in 1852. Late in the fall, the railroad entered the inclosure. A crop of corn that would yield from forty-five to sixty bushels per acre, was on the land. I did not notice particularly, what damage was done to that crop. I have seen hogs and horses and cattle in there that fall. I think from fifty to one hundred bushels of grain were destroyed. In 1853, plaintiff lost all the crop south of the railroad. I do not know what damage was done to the crop on the north side in that year. Don't know of any cattle being in there; have seen hogs in there; they got in through the railroad fence; that corn would have matured in November; it would have been worth from twenty to twenty-five dollars to have tended the south six acres, from June till it was in the crib. The plaintiff here rested. The defendants asked the witness the following questions: Is it not the usual custom in that town to fence only against cattle, and not hogs and sheep? to which question the plaintiff objected; the court sustained the objection and refused to permit the witness to answer the same, to which decision the defendants then and there excepted. This is substantially all the evidence. At the request of the plaintiff, the court instructed the jury as follows: Upon default, all the facts in the declaration are admitted to be true, and the jury have only to assess the damages which the jury think, from the evidence, the plaintiff has sustained.

The fact of the failure of the defendants to erect a good and

substantial fence, and to erect secure and convenient crossings and cattle guards, is admitted by the defendants, and need not be proved by the plaintiff. At the request of the defendants, the court qualified the foregoing instruction as follows: Yet, that the plaintiff has sustained any damages by such failure is not admitted, and plaintiff must prove that the failure to build such fence and crossings on the particular tract, mentioned in the declaration, caused him damage, or he is entitled to nominal damages only.

At the request of the defendants, the court instructed the jury as follows: The jury should allow no damages except such damages as the plaintiff has sustained by reason of the failure of the defendants to make good and substantial fences and crossings, upon a strip of land fifty feet wide on each side of the central line of the trunk of the railroad of defendants, commencing at a point four chains and eighty-seven links north of the southwest quarter of the southeast quarter of section 18, in township 33 north, of range 5 east of the third principal meridian, and running thence south seventy-three degrees, east eight hundred sixty-nine and four-tenths feet, if there was a small deficiency in the fence erected by the defendants, and plaintiff knew it at the time, and neglected to repair said fence.

The defendants asked the court to instruct the jury as follows: In estimating the damages in destroying the crops on the six acres, the jury should base their estimate upon what the corn was worth at the time it was destroyed, in the condition it then was. The jury should not estimate the damages at the amount which might have been made by the plaintiff by raising a crop and selling the same. Which instruction the court refused to give, to which decision of the court in refusing to give said instruction, the defendants then and there excepted.

Jury assessed the plaintiff's damages at $145. Defendants moved the court to set aside the assessment. Motion overruled by the court.

The defendants excepted, and brought the case to this court, by appeal.

The cause was heard before H. G. COTTON, at the September term, 1854, of the La Salle County Court.

GLOVER and COOK, for Appellants.

BUSHNELL and GRAY, for Appellee.

SCATES, C. J. There are two questions: First, how shall a party review the proofs and instructions on the inquest of damages, and is the case properly presented; and second, what is the true measure of damages.

The mode of presenting the first was laid down in *Motsinger, etc.,* v. *Coleman,* 16 Ill. R. 71, to be by presenting the proofs and instructions by affidavit or otherwise, to the circuit court, and moving to set aside the inquest, and preserving the same in the record by bill of exceptions. Such was the view of the court in *Morton* v. *Bailey et al.,* 1 Scam. R. 215, and that no exception on the inquest itself would be sufficient, without a subsequent motion. See *Gillett et al.* v. *Stone et al.,* 1 Scam. R. 543.

The inquest was taken in open court, and preserved by motion to set aside the inquest and bill of exceptions taken, containing the evidence and instructions. This all seems regular and proper, and I think this court should regard it as properly presented, and before it for adjudication, for I think the party should have a right to be heard for the correction of errors to his prejudice on the inquest.

I do not think there was any error in the admission of testimony of too extensive and broad a character, nor were the instructions as to the rule and measure of damages too broad for this case. I know the rule excludes profits generally, and prospective or speculative damages, in matters of breach of contract and covenant. *Sangamon and Morgan Railroad Co.* v. *Henry,* 14 Ill. R. 156; *Burnap* v. *Wight,* ibid. 301; *Gilpins* v. *Consequa,* 1 Pet. C. C. R. 95; *Boyle* v. *Reeder,* 1 Iredell Law. R., N. C. 614.

This rule may apply in trespass, and case for deceit, so as to exclude that which is too remote and so speculative. *Crain* v. *Petrie,* 6 Hill R. 522. But, in these actions, all the damage naturally and consequently resulting, may be given directly, or as smart money for the wrong and insult. *Denby* v. *Hariston,* 1 Hawks N. C. Law and Eq. R. 315, is an instance where a trespass, in March, by taking a field of growing grain, was punished in the full value of the matured crop, at the highest market price; and the profits derivable from sawing up logs were allowed against a trespasser who took them, in *Buckman* v. *Nash et al.,* 12 Maine R. 475. *Dickinson* v. *Boyle,* 17 Pick. R. 78; Sedgw. on Dam. 38 to 44; 2 Greenlf. on Ev. 242, Sec. 253 *et seq.,* and notes, 270; Secs. 266, 267 and notes; *Jeffrey* v. *Bigelow et al.,* 13 Wend. R. 518.

But, in cases of covenant and contract, the rule will confine the party to the natural and proximate consequence. 2 Greenl. Ev. 258, Sec. 256. Sedgwick finds fault with this for uncertainty, when we come to apply it to particular cases, (Sedgw. on Dam. 75); and it is found true in practice, that the rule is varied according to the view of the injury flowing legitimately from the breach. In determining whether this is so, we must

look to the nature and terms of the undertaking, and the thing to be done, and how it was expected and intended the parties should enjoy what they had bargained for, and how they were to be, and would be, benefited by the performance, and damaged by a breach of the particular engagement, under the particular circumstances. From a view of the whole together, we trace up to the breach all the alleged injury that is consequent on the state of things, according to its nature.

Thus, from a breach of promise to pay money, the damage is the amount with interest. All advantage from trading, or other speculation with the money, if paid at the day, are excluded; so are injuries for want of it. 7 Maine R. 54, 55. And this is more or less so with all contracts for personal property, and for manufactures, and for labor. They are capable of an estimate, or a valuation. But this valuation is sometimes varied, and made to embrace the fair and reasonable use in addition, where the property was intended as a means of prosecuting one's business. *Green* v. *Mann*, 11 Ill. R. 616. And again, the difference in the value of property at different days, or places, will be given, when the object was to sell, or resell for profit. 14 Ill. R. 156. But there is another distinction, and that is between real and personal property. Sedgw. on Dam. 47.

Keeping in mind the views and distinctions referred to, we readily comprehend and reconcile apparent contradictions in the decisions, as to the true rule of each class of cases.

Breach of contract to deliver things intended for consumption, or ordinary use, is compensated by an amount which would have re-purchased and delivered on the day, and at the place of performance. *Furlong* v. *Volleys et al.*, 30 Maine R. 491; *Edgar* v. *Boies*, 11 Serj. and Rawl. 445; *Owen* v. *Durham*, 5 Dana, 536.

If the breach be in a failure to make repairs or perform labor, the rule of damages will give the cost of the repairs, or what will hire the labor, but profits of a mill depending on the repairs of dam, cannot be included in the costs of repair, *Thompson* v. *Shattuck*, 2 Metcalf R. 615; but a fair rent or use of the mill was given with cost of improvements for not furnishing them, they constituting in part the means of prosecuting business as a manufacturer. 11 Ill. R. 616.

So of a breach by refusing to receive the labor contracted for, or its products, or not allowing it to be performed, the rule is not confined to mere nominal damages, but the difference between the cost of the actual labor, and the contract price of its products, or the articles furnished by it, will be given as damages. *Masterton* v. *The Mayor, etc., of Brooklyn*, 7 Hill R. 61.

In all these cases, both of trespass and contract, the particular circumstances, situation and intention of the party, and the use of the property, or of that bargained for, and so of labor, were respected, and had their full weight in determining what were the legitimate damages resulting from the breach. The same rule, allowing the profits of labor, was sanctioned in *Philadelphia, Wilmington and Baltimore R. R. Co.* v. *Howard*, 13 Hawk. R. 344, yet speculative profits are not within the rule. But looking to the nature of the contract, and the situation of the party, that he obtains his livelihood upon this very difference between the cost of his labor and the price to be paid for it, this difference seems the natural damage flowing from its breach, as a legitimate consequence to a person so situated.

So a party, under a promise of a lease, moves to the premises, and possession is then refused, suffers, as a natural result, the expense of such removal. *Driggs* v. *Dwight*, 17 Wend. R. 71.

So again, a failure to furnish machinery for a steam mill, will be compensated by a reasonable rent, or use of it, including decay of materials, etc., while the speculative profits of running the mill will be excluded. *Boyle* v. *Reeder*, N. C. Law R. 607.

I come, then, to another class of acts, contracts and covenants, having reference, in the effect and result of their performance, to enhance the value or increase the products and enjoyment of our lands, houses, etc.

Thus, in valuing a growing orchard, we cannot exclude the idea of its worth to the premises, and confine its value to young, unproductive trees alone. See 13 U. S. Ann. Dig. 1853, p. 166, Sec. 18 ; *Mitchell* v. *Billingsley*, 17 Ala. R. 391 ; see ibid. 408, as to growing timber. The loss of stock laid in for manufacturing, on a promise of a six months' lease of certain iron mills, was included in the damages for a breach. *Nurse* v. *Barns*, T. Raym. R. 77. The value of an anchor, lost by the breaking of a warranted cable, was included in the damages awarded for breach of the warranty. *Bonaduile et al.* v. *Brunton et al.*, 8 Taunt. R. 535, (2 Moore, 582, S. C.)

The principle is more fully illustrated in *Dewint* v. *Wiltse*, 9 Wend. R. 325, where the loss of the rent of a tavern stand, at a certain landing, was recovered on breach of a covenant to run a ferry to that landing. This case strongly illustrates the principle, and the distinction I am noticing. The covenantee owned the landing, and a tavern at it. The ferry was one of the means, or the chief one, of passing to and from it. Patronage to the tavern was a chief motive or consideration; yet nothing in relation to the tavern is inserted or found in the covenant. It is for running the ferry to that landing, near which the tavern is located. In assessing the damage for a

34

breach, the situation of the parties and property is considered, and reparation is made to include the injurious effect.

The covenant before us is for the erection and perpetual maintenance of sufficient fences, on each side of the railroad through these lands, for a crossing and cattle guard, which fences were to be made before the road was constructed. Looking to the situation of the respective parties, one owning and using this inclosed land for purposes of tillage, for his support and profit, the other desiring to construct a railroad through it, will the value of a young, growing crop, estimated as it stands at the planting, or early tillage season, compensate the farmer for a breach of this covenant, by means of which the stock pass in and destroy the crop, before it is so far matured as to be worth any more than the mere grain planted, and labor of preparing the ground and planting it? If this is all the full extent of redress of such a covenant, respecting such property, to a covenantee thus circumstanced, it would surely fall very far short of affording just and adequate compensation for the injury.

A farmer living upon and cultivating his own land, when he covenants for fencing protection, and its perpetual maintenance, may, and doubtless would, contemplate and intend greater benefit from it than the securing the annual value of the rent of the land, in damage for a breach, or the simple cost of putting up and repairing such a fence. The fence is intended to secure the crops to be planted, cultivated, matured and harvested; in other words, the fullest enjoyment of the land in the purposes for which it is used, and intended to be used. No construction of such a covenant, respecting such property, looking to such an end, would do justice to the party, which limited the obligation to the actual value of the crop before maturity. No farmer would receive a covenant for such an object, if he were told beforehand that the covenantor might destroy his labor and prospect at any season of the year, and settle the injury by paying the estimated value of the crop at the time of destruction. The covenant is not to be construed, and damages assessed, as upon a failure of bestowing common labor, or materials for its erection, upon a general hiring or purchase, nor even of a special contract, unless made with particular reference to the time of tillage or harvesting. It was intended, and should be enforced, to secure the full benefit to arise from the annual harvest according to the season.

Under such a view, the covenant is made to protect or remunerate the owner fully, in the sense and to the extent intended by him. No other view would, under such circumstances; and these are the results and damages naturally and necessarily

flowing from such a covenant, under such circumstances, and so fall within the legitimate rule.

Evidence tending to show how much the land would yield each season, was therefore proper, and within the intent of this covenant. And so, also, in fixing a value upon that product, the usual market value at the usual market, at the harvesting season, was admissible. Out of this it was proper to deduct the expense of tillage, harvesting and marketing. The remainder is the legitimate fruit of the land, labor and expense, and should be secured and awarded as the natural damages of a breach of covenant, made to protect and secure him in his annual tillage, by erecting and maintaining perpetually a sufficient fence.

Entertaining this view of the case, I am of opinion the judgment of the court ought to be affirmed.

*Judgment affirmed.*

SKINNER, J.   This was an action of covenant brought in the La Salle county court, by Ward, against the Chicago and Rock Island Railroad Company.

Judgment by default was entered, an inquest of damages, in open court, was had, and final judgment was rendered for the damages found, against the company.

At the taking of the inquest of damages, the company appeared, cross-examined the witnesses, objected to evidence, and to instructions given on the part of Ward, asked for instructions, and excepted to the rulings of the court adverse to them.

The company moved the court to set aside the verdict, which the court refused, and exception was taken.

The company appealed to this court, and assign for error the several rulings of the county court upon the inquest of damages, and the refusal to set aside the verdict. A bill of exceptions was taken, embodying the evidence, the instructions given and refused, and the several decisions of the court excepted to.

In the case of *Morton* v. *Bailey et al.*, 1 Scam. 213, this court hold, that in case of judgment by default, the defendant is out of court, cannot introduce evidence, cannot except to testimony, and cannot take a bill of exceptions ; but, that he may appear at the inquest and cross-examine the plaintiff's witnesses.

In the case of *Gillet et al.* v. *Stone et al.*, 1 Scam. 539, the defendants appeared at the inquest, took exceptions to instructions given by the court, moved to set aside the verdict, which motion was overruled, and exception was taken.

This court held, on error, that the exercise of the power to set aside the verdict, and grant a rehearing, was matter of discretion in the circuit court, with which this court could not interfere, and that this court could not reëxamine the decisions of that court upon the inquest of damages. This court also held in the same case, that the statute relating to decisions of the circuit courts, upon motions for new trials and for continuances, does not apply to verdicts upon inquests of damages. R. S. 416, Sec. 23.

According to these cases, this court cannot review the decisions of the court below assigned for error.

The case of *Vanlandingham* v. *Fellows*, 1 Scam. 233, decides that on default, a writ of inquiry of damages may issue to the sheriff, notwithstanding the statute, and may be executed by him, or his deputies, anywhere in the county. R. S. 415, Sec. 15.

According to these cases, there is little safety to a defendant, when he admits the plaintiff's cause of action by a default.

Frequently the amount of damages is the only real question between the parties, and why the defendant should be compelled to deny the cause of action before he can contest the amount of damages, cannot be satisfactorily explained upon principle.

To call an assessment of damages a trial, when the defendant is permitted only to appear and cross-examine the plaintiff's witnesses, and is allowed no remedies beyond the mere discretion of the court in which the action is pending, is a perversion of language.

The practice of assessing damages by the sheriff, at any time and place, within the county where he may please, is fraught with dangers, apparent to every one; but it is the law, and it is not for the courts to apply the remedy.

In assessments of damages, the defendant ought to be allowed to contest the amount of the plaintiff's damages, to introduce witnesses for that purpose, and when the inquest is taken in open court, to have the jury instructed as to the law; and he ought to have a remedy, in case he is deprived of any right under the taking of the inquest, the same as in cases of ordinary trial by jury. And such I understand to be the opinion of the Chief Justice; but in concurring in the opinion upon this point, I regard the cases of *Gillett et al.* v. *Stone et al.*, and *Morton* v. *Bailey et al.*, overruled, so far as they hold that the defendant has no right, upon inquest of damages, to contest the amount of the plaintiff's damages, and that the decisions of the circuit court upon questions arising upon the inquest, when presented by motion to set aside inquest, cannot be assigned for error.

The remaining questions are : Did the court err in permitting the plaintiff to prove what the corn destroyed would have been worth when matured and prepared for market; and whether the court erred in refusing the following instruction :

" In estimating the damages in destroying the crops, the jury. should base their estimate upon what the corn was worth at the time it was destroyed, in the condition it then was. The jury should not estimate the damages at the amount which might have been made by the plaintiff, by raising a crop and selling the same."

The measure of damages in this case undoubtedly is, the worth of the growing crop at the time it was destroyed, not for immediate use in the condition it then was, but with a view to the use of the ground until maturity, with the right to cultivate and harvest the corn.   This is ascertained by the probable amount of corn the crop would produce, and the probable value of the same in the market at the market season, deducting therefrom the necessary cost of cultivating, harvesting and taking the same to market.

The amount and value are necessarily hypothetical, and an opinion upon them can only be formed by taking into consideration the average product or yield of like crops, at the place and under like circumstances, and the average value of corn in the market at the place and time of market, and taking into consideration all facts tending to enlighten the mind upon these points.   In other words, What would a prudent man have been justified at the time in giving for the crop, with a view to its maturity, with the right to cultivate and harvest the same, and to have it reasonably secure from destruction while maturing, under all the lights the facts capable of proof would afford him.

This being an action *ex contractu*, I cannot concur in the opinion of the Chief Justice upon the question of the measure of damages.   The instruction was properly refused, because it is too narrow, leaving the jury to infer that the measure of damages was the value of the crop for use in its then condition, without reference to its final maturity, and excluding the right to use the ground for cultivation and removal of the crop, with the right to the security of sufficient reasonable inclosures.

I cannot perceive there was error in permitting the plaintiff to prove what the crop would have been worth when matured.

It is not the price of corn in the market, at the particular market season of this crop, that is to control the question of damages in this case, nor do I understand such to have been the object of the evidence ; but I can see no objection, for the purpose of ascertaining the general or average market value of corn, and therefrom ascertaining the present probable value of

a growing crop, to proof of such value for a series of years up to the time of trial.

This, certainly, would enlighten the jury as to the chances of market prices, and the probable value of this crop at the time of its destruction.

I regret that time will not permit a full examination of the questions involved in this case, with reference to the authorities.

I concur in affirming the judgment.

CATON, J. I agree that the defendant may present the facts which occurred on the taking of the inquest by affidavit, if taken before the sheriff; or by the certificate of the judge, as well as by affidavit, if taken in open court, on a motion to set aside the inquest; and may assign for error the decision of the court overruling such motion.

I agree to the rule of damages, as laid down by Mr. Justice SKINNER, but I do not think, for the purpose of ascertaining the value of the growing crop at the time it was destroyed, that it was competent to prove matters *ex post facto*, as the value of corn after that crop might have matured, or that a storm or fire which subsequently occurred must have destroyed the crop. I think the amount of damages should be determined in this case, by evidence of facts existing at the time of the breach complained of, and the judgment of men applied to those facts, the same as if the inquest had been taken the same day the crop was destroyed. The rule of evidence is different in some cases of *tort*.